UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X
In re:                                          :
                                                :   Chapter 7
DOROTHY R. PALMER,                              :   Case No.: 12-12211 (SMB)
                                                :
                Debtor.                         :
---------------------------------------------------X

## MEMORANDUM DECISION AND ORDER
## DENYING MOTION FOR STAY PENDING APPEAL

**A P P E A R A N C E S :**

LEO FOX, ESQ.
Attorney for Debtor
630 Third Avenue
18th Floor
New York, New York 10017

KNUCKLES, KOMOSINSKI & MANFRO, LLP
Attorneys for Selene Finance, LP and
Wilmington Savings Funds Society, as Trustee
565 Taxter Road, Suite 590
Elmsford, New York 10523

    Stuart L. Kossar, Esq.
        Of Counsel

SILVERMANACAMPORA LLP
Counsel to Kenneth P. Silverman, Chapter 7 Trustee
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753

    Ronald J. Friedman, Esq.
    Justin S. Krell, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

      The Debtor, Dorothy Palmer, moves for a stay pending appeal of this Court's

*Order Authorizing and Approving Sale of Debtor's Property, Free and Clear of all*

*Liens, Claims, and Encumbrances in Accordance with 11 U.S.C. § 363*, dated Dec. 7,

2016 (the "*Sale Confirmation Order*") (ECF Doc. # 247), which approved her chapter 7 trustee's sale of her Manhattan co-op apartment (the "Apartment"). Palmer also seeks a stay pending appeal of this Court's *Order Converting Chapter 11 Case to Chapter 7*, dated June 16, 2016 (the "*Conversion Order*") (ECF Doc. # 189). The latter order is presently on appeal before District Judge Gardephe and has been fully briefed. For the reasons that follow, Palmer's motion for a stay is denied.

## BACKGROUND

Palmer filed a chapter 11 case in this Court on May 22, 2012. Her principal asset was the Apartment, which she valued at $4 million. According to Schedule J, the monthly carrying cost – the mortgage and maintenance – was $12,000, but she listed monthly income of only $800. She could not and has not paid the mortgage or maintenance since at least the petition date. Instead, her mortgagee, J.P. Morgan Chase, has paid the maintenance, and added the amounts to the mortgage. In addition, the proof of claim filed by the co-op, 830-832 Broadway Owner's Corp., lists monthly late charges of $139.80 as well as one assessment and some legal fees.

Despite her financial inability to maintain the Apartment, Palmer continued to live in it during the chapter 11 case, and made no effort to sell it. Instead, most of the activity in the case focused on disputes regarding Connecticut real property formerly owned by Palmer that had been the subject of a foreclosure sale before the bankruptcy case was filed. The chapter 11 case languished, and motions to dismiss or convert were made by the United States Attorney, the United States Trustee and Selene Finance LP, the servicer for the purchaser at the Connecticut foreclosure sale.

Concerned about the lack of progress and the absence of an exit strategy from chapter 11, the Court entered an order directing Palmer to file a plan and disclosure statement by March 28, 2016.  (*Order Setting Deadline for Debtor's Filing of Chapter 11 Plan and Disclosure Statement*, dated Jan. 28, 2016 (ECF Doc. # 153).)  Palmer did file a plan and disclosure statement by the deadline, but the plan was unconfirmable on its face.  After a few unsuccessful tries to correct the deficiencies, the Court granted the United States Trustee's motion to convert the case for the reasons stated on the record at a hearing held on June 16, 2016.  (*See Conversion Order.*)  As noted, Palmer filed a timely appeal from the *Conversion Order*, and the appeal has been fully briefed.

Following the conversion, the United States Trustee appointed Kenneth Silverman, Esq. (the "Trustee") to serve as chapter 7 trustee.  Despite the conversion, Palmer continues to live in the Apartment without paying the mortgage or maintenance which she admittedly cannot afford.  As more fully described below, the Trustee moved expeditiously to market the property and conducted a competitive auction at which the highest and best bid was approximately $4.8 million inclusive of the buyer's premium,[1] all without any objection from Palmer.  Palmer was, however, disappointed with the auction price, and objected to the Trustee's motion to approve the sale.  She argued for the first time that if marketed as she now proposes, the Apartment could be sold for $6 million.  The Court approved the sale over her objection following an evidentiary hearing at which Palmer offered no evidence that the Apartment was worth more than the auction price.

---

[1] The "buyer's premium" shifts the obligation to pay the broker from the seller to the buyer.  The alternative is for the seller to receive a higher price and pay the broker from the greater proceeds.

3

Palmer now seeks to prevent the consummation of the sale. She has filed an appeal from the *Sale Confirmation Order*, and seeks a stay pending appeal. Although Palmer also seeks to stay the *Conversion Order*, her concern with the *Conversion Order* extends only so far as it resulted in the appointment of the Trustee and his sale of the Apartment. She has not offered any specific reason other than the impending sale to stay the *Conversion Order* or shown that she is likely to succeed on the merits of that appeal or will suffer an irreparable injury or prejudice as the result of a *Conversion Order* that has been in effect for six months. Accordingly, the Court denies her request to stay the *Conversion Order* and turns to the *Sale Confirmation Order*.

## DISCUSSION

A District Court may grant a stay pending appeal based upon a consideration of four factors: (1) did the stay applicant make a strong showing that she is likely to succeed on the merits; (2) will she be irreparably injured absent a stay; (3) will a stay substantially injure the other parties interested in the proceeding; and (4) the public interest. *McCue v. City of New York* (*In re World Trade Ctr. Disaster Site Litig.*), 503 F.3d 167, 170 (2d Cir.2007) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). The same standards govern the application for a stay pending an appeal from the Bankruptcy Court to the District Court. *See In re Savage & Assocs., P.C.*, No. 05 civ 2072 (SAS), 2005 WL 488643, at *1 (S.D.N.Y. Feb 28, 2005).

The first two factors are the most critical. *Nken v. Holder*, 556 U.S. 418, 434 (2009). "It is not enough that the chance of success on the merits be better than negligible." *Id.* (internal quotation marks and citation omitted). "By the same token, simply showing some 'possibility of irreparable injury' fails to satisfy the second factor."

4

*Id.* at 434–35 (citation omitted). "The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay. Simply stated, more of one excuses less of the other." *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2000) (internal quotation marks and citation omitted).

Palmer's arguments rest primarily on her contention that the sale price for the Apartment is inadequate because the Trustee and his auctioneer, Maltz Auctions, Inc. ("Maltz"), marketed and auctioned the Apartment in an improper manner. Rather than a mass solicitation and auction, Palmer contends that the Apartment should have been marketed through private showings to a select list of pre-qualified buyers, and this process would have produced a much higher price.

### A.    Likelihood of Success on the Merits

Palmer waived any objections to the marketing and auction process, but in any event, has failed to demonstrate a likelihood of prevailing on the merits of her arguments that it or the price it produced were inadequate. The Trustee initiated the auction process on September 21, 2016 by filing the *Trustee's Motion for Entry of Order (I) Authorizing and Approving Terms of Sale of Estates Interest in and to Debtors Cooperative Apartment, Free and Clear of All Liens, Claims and Encumbrances; (II) Establishing Auction and Notice Procedures; (III) Fixing Date for Sale Confirmation Hearing; and (IV) Granting Related Relief* (the "*Sale Procedures Motion*") (ECF Doc. # 221). The *Sale Procedures Motion* proposed an auction in accordance with the sale procedures attached to the motion, contemplated the retention of Maltz as broker and auctioneer, and stated that Maltz's efforts would consist of, among other things, notice of the auction:

5

>    (i) in a multi-property auction brochure to 10,000+ recipients via USPS mail, (ii) on 200+ real state and auction specific web sites, (iii) on Maltz's website, which receives approximately 100,000 page views every month, (iv) in Maltz's weekly email broadcast to 20,000+ recipients, (v) in certain newspapers, and (vi) by contacting known interested parties through prior business dealings.

*Sale Procedures Motion* at ¶ 12.

In other words, Maltz proposed a mass solicitation followed by a public auction. The Court approved the *Sale Procedures Motion* by order dated October 20, 2016. (*Order (I) Authorizing and Approving Terms of Sale of Estate's Interest in and to Debtor's Cooperative Apartment, Free and Clear of All Liens, Claims and Encumbrances; (II) Establishing Auction and Notice Procedures; (III) Fixing Date for Sale Confirmation Hearing; and (IV) Granting Related Relief*, dated Oct. 20, 2016 ("*Sale Procedures Order*") (ECF Doc. # 227).)  Palmer has been represented by counsel throughout the case and had notice of the *Sale Procedures Motion*.  She did not object to the *Sale Procedures Motion* or argue that the Trustee should market the Apartment through private showings to a select list of pre-qualified buyers instead of in the manner proposed by Maltz.

Maltz thereafter followed the marketing approach identified in the *Sale Procedures Motion*.  He posted information concerning the sale of the Apartment on the Maltz website beginning on September 19, 2016.  (*Affidavit of Richard Maltz on Behalf of Maltz Auctions as Broker and Auctioneer for the Chapter [7] Trustee*, dated Nov. 22, 2016 (the "*Maltz Affidavit*"), at ¶ 4 (ECF Doc. # 239).)  Maltz also publicized the sale and the Apartment on over 200 other real estate and auction specific websites, (*id.*), prepared and mailed full color information postcards on three separate occasions to

6

thousands of recipients, (*id.* at ¶ 5), prepared and placed classified and display advertisements in five newspapers, including the *New York Times*, *New York Post*, and *Wall Street Journal*, (*id.* at ¶ 6), prepared and placed banner advertisements on certain websites, (*id.* at ¶¶ 7-9, 14), included information regarding the sale of the Apartment in its weekly emails to its 30,000-plus member mailing list, (*id.* at ¶ 10), and advertised the sale via social media. (*Id.* at ¶¶ 11-13.)

The one hitch occurred on November 2, 2016, and was caused by Palmer. Maltz had arranged to show the Apartment to forty-four separate groups of people on that day. Palmer refused to allow them to inspect the Apartment, and the Trustee was forced to abandon the showings and commence an adversary proceeding to enjoin Palmer from any further interference with his marketing efforts and to permit the inspection of the Apartment. The adversary proceeding led to a consensual arrangement through which Palmer thereafter cooperated with the sale efforts. Nevertheless, one can only speculate as to the damage done to the auction process and field of possible bidders because Palmer cancelled the November 2 showings unilaterally.

The auction was held on November 16, 2016. Eleven co-brokers registered to participate, there were twenty-four registered bidders, and seven actively participated in the auction. The bidding began at $2.8 million and the winning bid was $4,575,000, plus a buyer's premium of 4%, for a total purchase price of $4,758,000. The buyer also agreed to pay the 2% flip tax and a 1.825% transfer tax.[2] (*Id.* ¶¶ 19-20.)

---

[2] If the estate, as seller, had to pay these amounts, someone would have had to bid $4,932,993.75 for the estate to net the $4,575,000 auction price.

7

The Trustee moved before the Court to approve the sale to the winning bidder. Palmer objected, arguing for the first time that if the Apartment was marketed privately to a select list of potential buyers, it would command a price of $6 million. The Court conducted an evidentiary hearing on the return date at which the Trustee offered the *Maltz Affidavit* in support of his application. In response to the Court's inquiry, Palmer did not object to the receipt of the *Maltz Affidavit* and declined the opportunity to cross-examine Maltz. Furthermore, although she was granted permission to make a personal statement, she did not testify under oath, submit to cross-examination or produce non-hearsay evidence that her Apartment was worth $6 million if marketed as she now proposes. The Court overruled Palmer's objection for the reasons stated on the record, and entered the *Sale Confirmation Order* on December 7, 2016.

As noted, Palmer never objected to the retention of Maltz, his marketing plan or the sale of the Apartment through a public auction. Hence, she waived any objection to these sale procedures.[3] Furthermore, she has failed to offer credible evidence that the auction price is inadequate. In fact, the best evidence of the fair market value is the price produced by a competitive auction. The only other admissible evidence of value was Palmer's statement in her schedules that the Apartment was worth $4 million.

Aside from her current assertions, Palmer offers the unsworn correspondence between herself and two brokers to hypothesize that the Apartment is worth $6 million. In a November 15, 2016 letter from Meryl Goodfader, a broker employed by Halstead

---

[3] Palmer's attorney has implied that there was no purpose to objecting because the *Sale Procedures Order* was interlocutory and non-appealable. Palmer was required to preserve any objection by raising it in opposition to the *Sale Procedures Motion*. Her argument confuses preserving an objection with appealing from an order overruling it.

8

Property and working across the street from the Apartment, Goodfader stated that she felt "quite confident that the property could command" a sale price of over $6 million. The Goodfader letter appended listings for several other properties in the same neighborhood but did not explain why they were comparable to the Apartment. Similarly, a November 22, 2016 email from Leonard Steinberg, a broker employed by Compass, stated that he "would have thought the property would sell for at least $5.5 million, probably closer to $6 million." The email included materials promoting Steinberg's firm, which were wholly irrelevant to the value of the Apartment.

Although the email and letter were sent to Palmer before the sale confirmation hearing, Palmer never called either broker as a witness at the hearing. Furthermore, numerous brokers registered as co-brokers, and according to the Trustee's counsel, several brokers, including Steinberg's employer Compass, attended the auction. Yet neither Compass nor Halstead produced a buyer prepared to pay what Steinberg and Goodfader claim the Apartment is worth. Given that the sale price was achieved after a robust marketing process and public auction – a process Palmer never challenged - and in light of the lack of any evidence beyond speculation that a higher price could be achieved, the Debtor cannot demonstrate a likelihood or even a remote possibility of success on her appeal of the *Sale Confirmation Order*.

### B.    Irreparable Harm

Palmer has also failed to show that she will be irreparably harmed if a stay does not issue. She does not contend that the sale of the Apartment where she has lived for many years will cause irreparable harm; her own plan is to sell the Apartment in the next 60 to 75 days. Rather, the harm she identifies is the reduction in her equity. The

9

Court recognizes that Palmer is 70 years old, and would like to maximize her equity to be used to procure living accommodations elsewhere.  However, her claim of irreparable harm is based entirely on her belief that the Apartment can be sold for $6 million.  There is no evidence supporting that notion, and the auction price is the most compelling evidence of the value of the Apartment.

### C.     Harm to the Other Parties

Conversely, the parties to the sale and the chapter 7 case will suffer substantial prejudice if the stay issues.  The buyer would undoubtedly like to consummate the transaction, and I was advised at oral argument that he is in the process of obtaining approval from the co-op board which is prepared to hold a telephonic meeting to expedite the process.  In addition, the Trustee would like to collect the purchase price.  If the consummation of the sale is unduly delayed by a stay, the Trustee will be unable to close, the buyer will eventually be able to walk away from the transaction and the Trustee will be required to return his deposit.  The Trustee will then have to start over with a new marketing process, possibly another auction and a new round of co-op approvals.  In the end, there is no guarantee that the Apartment can be resold at a higher and better price, and all the while, the maintenance, unpaid mortgage and additional co-op related charges will continue to consume the equity.

The creditors will also suffer substantial prejudice if the *Sale Confirmation Order* is stayed.  They have waited nearly five years to be paid.  During the four years that Palmer was a debtor-in-possession under chapter 11, she made no effort to sell the Apartment that she could not afford to maintain, and until the Court directed her to do so, did not file a plan or disclosure statement.  Obviously, she was content to maintain

the *status quo* and live in the Apartment. The Trustee's effort to liquidate her principal asset and only source of payment will finally lead to the payment of her creditors' claims.

Palmer's attorney contended at oral argument that she bore the entire risk that the Apartment could not be sold at a higher price because a sale at a lower price will simply eat into her equity. This may be true, but only up to a point. Under Bankruptcy Code § 726(a), the Trustee must pay all allowed claims with legal interest before Palmer is entitled to receive her equity (other than her homestead exemption which comes off the top). The administrative expenses have grown as a result of the litigation surrounding the sale of the Apartment. In addition, Palmer continues to accrue unpaid maintenance, mortgage charges and other co-op related charges. Furthermore, the IRS has filed a claim in the approximate amount of $79,000, and moreover, any sale may generate a substantial capital gains tax; Palmer's attorney represented at a hearing that her basis in the Apartment is approximately $1.5 million. (*Transcript of Hearing held 6/16/16*, at 7:15-23 (ECF Doc. # 202).) At some point, there may be no equity left in the Apartment, and at that point, the creditors will suffer.

**D.    Public Interest**

Finally, the public interest will be served by respecting the integrity of the auction process. A bankruptcy court is afforded substantial discretion as to the manner in which it conducts a judicial sale of estate property. *Consumer News & Bus. Channel P'ship v. Fin. News Network Inc.* (*In re Fin. News Network Inc.*), 980 F.2d 165, 169 (2d Cir. 1992). Nevertheless, respect for the integrity of the auction process is an important consideration:

11

> While the Court certainly appreciates the need to maximize payment of claims, the Court must also always keep one eye cocked on promoting and preserving the integrity of the judicial process. Reneging on clearly established and properly conducted procedures in order to generate some additional dollars for the estate undermines the integrity of the judicial process; indeed, it can undermine the integrity and reputations of the individual litigants and lawyers. The public in general, and all participants at auctions in particular, need to have confidence in the judicial system. A court order reopening the auction process when procedures were clearly established, when the auction was conducted without fraud or collusion and in compliance with the procedures, and when an adequate bid was accepted, will undercut such confidence and faith in the system. This, the Court will not allow, even if reopening the auction would generate more proceeds for the estate.

*In re Bigler, LP*, 443 B.R. 101, 115 (Bankr. S.D. Tex. 2010); *accord In re Gil-Bern Indus., Inc.*, 526 F.2d 627, 628 (1st Cir. 1975).

There are exceptions, such as when the auction price is manifestly inadequate, *Gil-Bern*, 526 F.2d at 628, or the asset has significantly increased in value between the time of the auction and the motion to confirm the sale, *Krys v. Farnum Place, LLC* (*In re Fairfield Sentry Ltd.*), 768 F.3d 239, 247 (2d Cir. 2014), but Palmer has failed to show that they apply. She has not offered credible evidence that the auction price is manifestly inadequate or the Apartment is rising in value, and she has certainly not shown that there is someone willing to pay a higher price. Her entire argument is based on sheer speculation that she views as unrebutted evidence of an undisputed fact. Yet even the brokers she identified as supporting her position failed to produce a buyer at the auction willing to pay what she says the Apartment is worth. Given the importance of auctions to the proper functioning of the bankruptcy system, the Court is not inclined

in the exercise of its discretion to ignore the results of a competitive auction based on Palmer's hope that someone will be willing to pay substantially more.

Accordingly, the motion for a stay pending appeal is denied.

So ordered.

Dated: New York, New York
December 22, 2016

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge